JOSEPHINE MONCADA *et al.*, on Behalf of Themselves and All Other Persons Similarly Situated, *et al.*, Petitioners-Appellants, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

First District (6th Division) No. 1—90—0847

Opinion filed April 19, 1991.

Jenner & Block, of Chicago, for petitioners Gary Tiritilli, Kathleen Preuss, Susan Schlott and Citizens Utility Board.

David L. Nixon, of Illinois Commerce Commission, and Hopkins & Sutter, both of Chicago (Paul F. Hanzlik and Thomas M. Dethlefs, of counsel), for respondents.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Petitioners Gary Tiritilli, Kathleen Preuss and Susan Schlott (Group B Complainants) and the Citizens Utility Board (CUB) brought a complaint before the Illinois Commerce Commission (Commission) alleging that respondent Commonwealth Edison Co. (Edison) had misclassified and, thus, overcharged them in violation of sections 9—240, 9—241 and 9—252 of the Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111²/₃, pars. 9—240, 9—241, 9—252). Following a hearing, the Commission denied petitioners' complaint and this appeal ensued. We have jurisdiction pursuant to section 10—201 (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201).

The issues on appeal are: (1) whether the Commission's interpretation of the tariff as requiring Group B Complainants to pay the higher customer charge was arbitrary, capricious or an abuse of discretion; and (2) whether the Commission's final order of January 24, 1990, was a modification of a prior final order.

On September 3, 1986, Josephine Moncada, Ruth Lange, John Kois and Joan Kupfer (Group A Complainants), on behalf of themselves and all others similarly situated, Group B Complainants, on behalf of themselves and all others similarly situated, and CUB filed a complaint against Edison raising issues regarding Edison's 19th Revised Tariff Sheet No. 9, effective on December 10, 1984. As Group A Complainants are not a party to this appeal, we will only address the Group B issues.

The tariff sheet was filed in response to an order of the Commission requiring Edison to file within 120 days a tariff sheet for a revised Rate 1 "to include a split customer charge for residential customers based on variations in the marginal costs of service." The tariff provides in relevant part:

"The monthly customer charge shall be $9.92 for customers residing in buildings containing 1 or 2 dwelling units. This shall include, but not be limited to structures commonly referred to as single family detached houses, single family attached houses, row houses, town houses, semi-detached houses, duplexes, two-flats and two family homes.

The monthly customer charge shall be $5.40 for customers residing in buildings containing 3 or more dwelling units."

Although the rates have subsequently changed, the variance in the monthly charge for customers residing in one- or two-unit dwellings as opposed to customers residing in three-unit dwellings has remained.

Prior to preparing the tariff sheet at issue, Edison studied several classification methods. The classification system selected by Edison was one in which charges were determined according to the number of customers served from a single service connection. Thus, customers residing in structures typically served by one service "drop" for every one or two units were charged the higher rate, and those served by a service drop for three or more units were charged the lower rate. The street address was used to determine the type of structure in which the customer resided. A single address without any unit number or letter was identified as a single-family structure, row house or town house. Edison's representative, Mr. Millard, testified at the hearing before the Commission that customers residing in town houses, row houses and other similar structures were charged the higher rate because the standard service policy is that these structures were provided with one service connection for two adjacent units. Millard cited Edison's rule book, which sets forth Edison's policy regarding attachment installations for row houses. As further evidence of the type of service connection in row houses, Edison had its marketing personnel conduct a field survey. Five locations were selected where row houses were found in each of Edison's service divisions. According to the results of the survey, 60% of the units surveyed had one meter per service, 20% had two meters per service and 20% had three or more meters per service.

On July 14, 1989, the hearing examiner prepared a proposed order denying the relief sought by petitioners and submitted it to the Commission for consideration. On October 17, 1989, the Commission held a "bench" session to discuss the proposed order. Edison claims that, although the order was extensively discussed, the Commission did not enter a final order or decision. The minutes of the bench session reflect that the proposed order was to be "held" over to a later date. No written decision was ever prepared, signed, filed or served by the Commission as a result of this meeting. The petitioners, however, refer to the bench session as a formal proceeding where a decision was made that petitioners should have been classified at the lower rate. The proposed order was subsequently resubmitted to the Commission on January 24, 1990, and this time the order was ap-

proved. The findings at the conclusion of the order which are relevant to this appeal are that the inclusion of structures with more than two units but which are only one living unit high in the class charged the higher rate is supported by the method used by Edison in applying this tariff, as well as the cost methodology used to develop costs for classifying residential customers into separate categories. The findings further state that rates developed for classes of customers reflect averages of the costs incurred to serve individual customers, and that where the costs reflect the predominant method of providing service to the class, the development of the costs and rates is reasonable.

Petitioners' petition for rehearing was denied, and this appeal followed.

■■ In addition to its argument on the merits of this appeal, Edison raises two procedural questions. The first question relates to the proper parties to the order before the Commission and also to this appeal. Initially, Edison correctly states that Group B Complainants could not represent other persons similarly situated because the Commission did not have the power to hear class actions. (See *Moncada v. Illinois Commerce Comm'n* (1987), 164 Ill. App. 3d 867, 872, 518 N.E.2d 349.) Edison also claims that CUB does not have the power to sue on behalf of all customers similarly situated to Group B Complainants. However, section 1 *et seq.* of the Citizens Utility Board Act gives CUB the power to represent "utility consumers before the Illinois Commerce Commission" (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 902). The Citizens Utility Board Act further provides:

"(2) The Corporation [CUB] shall have all powers necessary or convenient for the effective representation and protection of the interest of utility consumers and to implement this Act, including,

(a) *** to sue and be sued in its own name ***." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 905.)

Therefore, we conclude that the parties to the complaint brought before the Commission as well as this appeal are Gary Tiritilli, Kathleen Preuss, Susan Schlott and CUB.

■■ Edison further claims that this court does not have jurisdiction of this appeal because the petitioners failed to file their petition for rehearing at the proper location. According to the Commission's rules of practice, all filings must be made at the Commission's principal office in Springfield, Illinois. (83 Ill. Adm. Code §200.70(a) (Supp. 1986).) If an emergency exists, a filing may be authorized at the Commission's office in Chicago. In this instance, the party is required to also file an affidavit affirming the emergency and that no person will

be prejudiced. (83 Ill. Adm. Code §200.70(b) (Supp. 1986).) In this case, the petitioners filed their petition for rehearing at the Commission's Chicago office without the required affidavit. Edison was served with a copy of the petition on the day it was filed. Although Edison asserted its jurisdictional argument before the Commission when the petition for rehearing was filed, the Commission rejected it and proceeded to deny the petition for rehearing on its merits. The administrative rules on which Edison relies are the Commission's own procedural rules, which it can relax or modify in the absence of any showing of injury or substantial prejudice. (*Cartwright v. Illinois Civil Service Comm'n* (1980), 80 Ill. App. 3d 787, 791, 400 N.E.2d 581.) Furthermore, no step other than the timely filing of a notice of appeal is jurisdictional. *Illinois Telephone Association v. Illinois Commerce Comm'n* (1978), 57 Ill. App. 3d 968, 971, 373 N.E.2d 676.

I

Petitioners' first contention is that the Commission's final order of January 24, 1990, which interpreted the tariff to require Group B Complainants to pay the higher service charge was arbitrary, capricious and contrary to law. Petitioners argue that the Commission incorrectly interpreted the language of the tariff provision. The tariff provides that a higher service charge will be issued to customers residing in buildings with one or two dwelling units. The tariff states "[t]his shall include but not be limited to structures commonly referred to as single family detached houses, single family attached houses, row houses, town houses, semi-detached houses, duplexes, two flats, and two family houses." Customers residing in buildings containing three or more dwelling units will be charged the lower rate. The tariff was established to impose charges based on the customer's cost of service. Edison determined that the cost of service varied depending on the number of customers served from a single service connection. Buildings with one or two dwelling units were normally serviced by a single or double meter configuration, and buildings with three or more units were normally served by a "gang meter" configuration. Because the single or double meter configuration was more costly to service than the gang meter configuration, customers in the one- or two-unit buildings were charged the higher rate. The Group B Complainants reside in row house-type structures which are one dwelling unit high, and they were classified at the higher service charge.

■ The Commission's findings on questions of fact are *prima facie* true, and its orders are *prima facie* reasonable. A reviewing

court can only reverse a Commission rule, regulation, order or decision if the Commission is without jurisdiction, its order is not supported by substantial evidence or the order or manner in which it was decided violates Federal or State constitutional laws to the prejudice of the appellant. Furthermore, the party challenging the order has the burden of proof. (Ill. Rev. Stat. 1987, ch. 111²/₃, pars. 10—201(d), (e)(IV); *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204, 555 N.E.2d 693; *General Mills, Inc. v. Illinois Commerce Comm'n* (1990), 201 Ill. App. 3d 715, 720, 559 N.E.2d 225.) The Commission's determination of a question of law, however, is not binding on review. *Business & Professional People for the Public Interest*, 136 Ill. 2d at 204.

■ The petitioners claim that, although they live in structures which are one dwelling unit high, the buildings contain three or more dwelling units, and they should have been charged the lower rate. They also claim that the language of the tariff is clear and unambiguous and that the reference to row houses is to row houses of one or two units. The Commission found the language of the tariff ambiguous because the sentence which follows the reference to one or two dwelling units states:

"This shall include but not be limited to structures commonly referred to as single family detached houses, single family attached houses, row houses, town houses, semi-detached houses, duplexes, two-flats and two family houses."

It is not clear whether this language refers only to one-unit-high structures with one or two dwelling units, as petitioner maintains, or whether it includes one-unit-high structures with three or more dwelling units. From our reading of the language, we conclude that either interpretation could be made, and accordingly, we agree that the language of the statute is ambiguous.

■ Petitioners next claim that any ambiguity in a tariff must be resolved against the drafter and in petitioners' favor. However, this rule has not been rigidly applied where an interpretation can be made which is consistent with the legislative intent. (*Illinois Telephone Association v. Illinois Commerce Comm'n* (1977), 67 Ill. 2d 15, 20, 364 N.E.2d 63; *General Mills, Inc.*, 201 Ill. App. 3d at 721.) Rather, courts will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with its administration and enforcement. (*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152, 447 N.E.2d 295.) The reason for this deference is that agencies can make informed judgments about the issues based on their experience, and they constitute

an informed source for ascertaining the legislative intent. (*Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 153.) In construing a statute or regulation, an agency can take administrative notice of its own findings and orders. (*General Mills, Inc.*, 201 Ill. App. 3d at 721, citing *City of Hurst v. Illinois Commerce Comm'n* (1983), 120 Ill. App. 3d 354, 458 N.E.2d 568.) Finally, a tariff should not be strictly construed against the agency when there is a reasonable construction which conforms to the intention of the drafters. *General Mills, Inc.*, 201 Ill. App. 3d at 721.

 In this case, the Commission resolved the ambiguity of the tariff by looking at the intention of the framers of the tariff, the plain meaning of the terms "row houses" and "town houses," the cost methodology which Edison used to classify residential customers into two separate categories, Edison's standard service policy for row houses and other structures one living unit high and Edison's reliance on the United States postal address system to distinguish between buildings with single or double unit dwellings and those with three or more units. The Commission also considered the results of the survey of the manner in which electric service is provided to buildings which contain three or more living units but are only one living unit high. Finally, the Commission considered its decision in a prior order which dealt with the same tariff which is at issue in this case. In *Wagner v. Commonwealth Edison Co.* (1986), No. 85—0370 (Order, Illinois Commerce Commission), the Commission held that a customer residing in a six-unit building where the dwellings were only one living unit high was properly charged the higher rate. We conclude that based on these factors, some of which are addressed in greater detail below, the Commission's construction of the tariff was reasonable and consistent with its purpose.

 Petitioners further claim that the Commission's construction of the tariff was not based on substantial evidence. However, contrary to petitioners' contention, the Commission considered the evidence presented by R. W. Millard, the supervisor of rate administration, the testimony of a member of the rate design department, the survey results as well as supporting documents. Millard presented testimony regarding the process by which Edison selected a system in which over two million customers could be classified into the two categories of service charges and which could be implemented within 120 days. He also stated that Edison classified row houses and other similar structures in the higher rate category because the standard service policy is the provision of one service connection for two adjacent units. Millard supported this statement with reference to Edison's

rule book, which sets forth Edison's policy for service installations for row houses. The rule book also contains a footnote which provides that when adjacent units are not individually owned, "a common service run to a multiple meter socket may be used." Evidence was also presented regarding a survey conducted by Edison's marketing personnel. The sample was taken from five locations where row houses were built in each of Edison's service divisions. According to the results of the survey, 80% had one or two meters per service and 20% had three or more meters. Millard stated that the results verified that Edison's assumed typical method of service to row houses was like the method of service to structures with one or two dwelling units. Millard further stated that rate design is based on average cost of service for a class of customers, that customer classes typically cover wide ranges of customer costs, and that it would be administratively burdensome and impractical to create many subclasses of customers and apply different rates to capture these cost differences. In making its determination, the Commission also considered its prior order, *Wagner v. Commonwealth Edison*, in which the Commission found that a case-by-case investigation of the actual cost of service to the customer would impose a non-cost-effective burden on Edison and the Commission.

As we previously stated, "the Commission's orders are *prima facie* reasonable, and a party appealing from an order has the burden of proof on all issues raised." (*General Mills, Inc.*, 201 Ill. App. 3d at 720.) The only argument petitioners assert in support of their claim that the Commission's order was unreasonable is that the survey conducted by Edison was unreliable. Although petitioners cite several flaws in the survey, they have not presented any evidence contrary to the results of the survey. They also appear to have misunderstood the purpose of the survey as well as Millard's representations regarding it. We, thus, conclude that petitioners have failed to prove that the Commission's order was unreasonable.

## II

Petitioners next contend that the Commission entered a final decision which it later improperly reversed without proper notice, hearing or explanation. In support of their position, petitioners rely upon section 10—113 of the Public Utilities Act, which in part provides:

"[T]he Commission may at anytime, upon notice to the public utility affected, and after opportunity to be heard as provided in the case of complaints, rescind, alter or amend any rule, reg-

ulation, order or decision made by it." (Ill. Rev. Stat. 1987, ch. 111⅔ par. 10—113.)

The factual basis argued by petitioners is that on October 17, 1989, the Commission convened a bench session to discuss and vote on the hearing examiner's proposed order which denied petitioners complaint. It was at this meeting, according to petitioners, that the Commission by a 4-2 vote, rejected the proposed order, determined that the tariff was not ambiguous and directed the hearing examiner to revise the proposed order to reflect that Group B customers be charged the lower rate.

It is clear, and petitioners do not dispute, that the Commission's actions on October 17, 1989, did not constitute a rule, regulation or order. Rather, they argue that the Commission's actions amounted to a "decision." We disagree.

■ The Administrative Review Law provides that a decision "means any decision, order or determination *** which affects the legal rights, duties or privileges of parties and which terminates the proceedings before administrative agency." (Ill. Rev. Stat. 1987, ch. 110, par. 3—101.) This language can hardly be used to describe what happened on October 17, 1989. The minutes of the bench session only provide that the order was "held." No written decision or proposed order was prepared, docketed or served. As a result, the only final order entered by the Commission was the final written order of January 24, 1990.

While petitioners cite several cases in support of their position, all are easily distinguished. In *Union Electric Co. v. Illinois Commerce Comm'n* (1968), 39 Ill. 2d 386, 235 N.E.2d 601, *Black Hawk Motor Transit Co. v. Illinois Commerce Comm'n* (1947), 398 Ill. 542, 76 N.E.2d 478, and *Commonwealth Edison Co. v. Illinois Commerce Comm'n* (1988), 180 Ill. App. 3d 899, 536 N.E.2d 724, the orders at issue were clearly final. In their submission of additional authority, petitioners refer us to *Firstier Mortgage Co. v. Investors Mortgage Insurance Co.* (1991), 498 U.S. 269, 112 L. Ed. 2d 743, 111 S. Ct. 648. While *Firstier* does involve a nonfinal order, it does not apply to the issue before us. Rather, *Firstier* held that Federal Rule of Appellate Procedure Rule 4(a)(2) permits a notice of appeal filed from a nonfinal decision to serve as an effective notice of appeal from a subsequently entered final judgment. In sum, petitioners have cited no authority to support their position that the October 17, 1989, bench session resulted in the entry of a final order. Further, the very fact that the order was "held" evidences the clear intent of the Commission that the

decision was not final. See *Walker v. Lebanon Stone* (1950), 312 Ky. 625, 229 S.W.2d 163.

Finally, we address the negative and chilling effect petitioners' position would have upon administrative agency deliberations. Such a rule would hamstring an agency in its ability to correct its own errors before a decision became final. Further, it would silence the deliberative nature of agency proceedings. Commission members would decline to render first impression votes or attempt to convince others of their position in fear that such action would be construed as a final, irreversible vote. In effect, the very first position taken by a Commission member would be cast in stone and could only be changed upon giving the parties notice and an opportunity to be heard. We therefore decline to adopt such an impractical and inflexible view. "An administrative agency unquestionably has the authority, just as has a court, to reconsider and change its orders during the time it retains control over any question under submission to it." *Union Light, Heat & Power v. Kentucky Public Service Comm'n* (Ky. App. 1954), 271 S.W.2d 361, 365-66.

For all of the above reasons, the Commission's order entered January 24, 1990, is affirmed.

Affirmed.

McNAMARA and LaPORTA, JJ., concur.